UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BOBBI JO YOUNKER,

        Plaintiff,

    v.                                                                    Case No. 22-cv-204-JPG

CITY OF WOOD RIVER, ILLINOIS; BRAD
WELLS; and CHRIS JOHNSON,

        Defendants.

## MEMORANDUM AND ORDER

This matter comes before the Court on the defendants' motion for summary judgment (Doc. 32). Plaintiff Bobbi Jo Younker has responded (Doc. 37), and the defendants have replied to that response (Doc. 39). In connection with the summary judgment motion, the defendants have filed two motions to strike two exhibits Younker filed in connection with her response (Doc. 40 & 45). Younker has responded (Doc. 41), and the defendants have replied to that response (Doc. 42).

Younker, a police officer for the defendant City of Wood River at all relevant times, brings this case asserting claims for discrimination and harassment based on her sex/sexual orientation (lesbian) and for retaliation based on her complaints about that discrimination and harassment. At most relevant times, defendant Brad Wells was the Chief of Police of the Wood River Police Department ("WRPD"), and defendant Chris Johnson was the Deputy Police Chief. Younker claims they participated in and failed to remedy known discrimination, harassment and retaliation.

Because there is little evidence of a hostile working environment or a neutral employment policy that fell more harshly on a protected group, the Court will grant summary

judgment for the defendants on Younker's harassment and disparate impact claims.  And while it is clear the defendants treated Younker's differently than it treated her coworkers, it is a very close call whether the disparate treatment was *because of* her sex/sexual orientation, so the Court will deny summary judgment and send those claims to the jury.  Similarly, Younker's retaliation claim is sufficiently supported to go to a jury.

## I.      Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.  Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture."  *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted).  This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.  *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways.  It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed.

R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.    Facts

### A.    Evidence Considered

The defendants urge the Court to strike two declarations submitted in support of Younker's opposition to their summary judgment motion. They argue that the statements are not sworn or declared under penalty of perjury and contain statements not made on the declarant's personal knowledge.

Federal Rule of Civil Procedure 56(c)(4) requires that, at the summary judgment stage, declarations be made based on the declarant's personal knowledge and set out facts that would

be admissible in evidence.  Furthermore, to be used at the summary judgment stage, statements must be sworn, for example, in an affidavit or deposition, or declared as true under penalty of perjury pursuant to 28 U.S.C. § 1746.  If they are not, the Court must disregard them.  *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985); *see, e.g., Garner v. Kinnear Mfg. Co.*, 37 F.3d 263, 268-69 (7th Cir. 1994).

The two exhibits in question are the unsworn declarations of Brandon Desherlia, a former police officer and sergeant with the WRPD, and Joshua Timmins, a sergeant with the WRPD and union representative for the WRPD police officers.  The original declarations attached to Younker's summary judgment response (Docs. 37-12 & 37-13) are not sworn and are not declared under penalty of perjury pursuant to 28 U.S.C. § 1746.  Younker has since submitted amended statements from Desherlia and Timmins declared under penalty of perjury (Docs. 43 & 44).

It is clear that the original declarations cannot support Younker's opposition to summary judgment because they were not sworn or declared under penalty of perjury.  However, Younker has promptly and adequately cured this defect by submitting amended declarations within two weeks of when the defendants noted the deficiency.  The defendants complain that those declarations are late because they were not filed by the response deadline and urge the Court to strike them.  The Court declines to do so.  The defects have been cured, and the defendants have suffered no prejudice from Younker's failure to meet the response deadline.  The substance of the declarations was revealed in time—and possibly in earlier discovery as well—so the defendants could not have been surprised by the late declarations.  The defects having been cured and the defendants having suffered no prejudice, the Court will deny the motions to strike based on the failure to be sworn or declared under penalty of perjury.

4

The defendants also object that the declarants make statements not based on personal knowledge but instead based on speculation or hearsay.  While it is true that declarants may only make statements based on their personal knowledge, the Court has reviewed the declarations in issue and finds that many of the statements therein qualify as based on personal knowledge.  To the extent they stray into speculation or hearsay, the Court will disregard those particular statements for the purposes of this motion.  The Court notes, however, that some of the "speculation" cited by the defendants actually reflects reasonable inferences that the Court must make in Younker's favor at the summary judgment stage.  The Court will not strike the declarations.  Instead, in setting forth the facts for the purposes of this motion, it will consider the statements made on personal knowledge in the declarations made under penalty of perjury (Docs. 43 & 44) and the reasonable inferences that can be drawn from those statements.

B.     Facts

Viewing all the admissible evidence and the reasonable inferences that can be drawn from it in Younker's favor, the evidence establishes the following relevant facts for the purposes of this motion.

Younker began working as a patrol officer for the WRPD in January 2007.  Younker is a lesbian and is open about her sexual orientation.  Several months after she began working for the WRPD, two of her coworkers began asking her intrusive questions and making comments about her sexual orientation and preferences.  Younker did not report the inappropriate comments at the time, and over time, the coworkers became friends with Younker and their comments stopped or slowed down.

In 2009, defendant Johnson, began regularly making inappropriate comments to Younker displaying stereotypes about lesbians, how they present themselves, and the nature of their

relationships. Those statements included disapproval of Younker's behavior displaying or expressing her sexual orientation. Those comments were continuous over the years that followed until February 2020, including after Johnson became deputy chief in January 2019. Younker did not report Johnson's comments or other harassment, discrimination or retaliation by Johnson and Wells until 2019, when Desherlia became her supervising sergeant. In fact, in connection with a 2011 sexual harassment training, she expressly denied she had experienced sexual harassment at work.

Younker's supervisors had differences of opinion on her job performance. Johnson thought Younker was a capable officer but found faults with her performance, like writing below average reports. Other supervisors like Timmins, Desherlia, and Sergeant Brady Greene had a better impression of her, thought she was a good officer, and found her reports to be good. Greene thought she was above average in a number of areas, although below in self-initiated policing activity and thought she had violated some policing procedures. Based on their observations and interactions with Johnson and Wells, Timmins and Desherlia came to believe Johnson and Wells held Younker to a higher standard than other officers and were more critical of her than other officers who performed similarly.

In March 2018, defendant Wells became chief of the WRPD.

*Sergeant Promotion*

Younker was passed over a number of times for promotion to sergeant. Historically, the sergeant selection process involved a written test, an interview, and preference points for education and veteran service. The chief of police also had discretion to award up to 10 additional points known as "Chief's Points." The chief would normally solicit recommendations from the supervisors of the candidates but would use his discretion in making the final Chief's

6

Points award.  The applicants were then ranked in order of their point totals, and the highest scorers were offered sergeant position as they came open.  Passage of the written test was mandatory, so even someone with a high score could not be promoted if they failed the written test.  The list was recompiled every three years as required by state law.  *See* 65 ILCS § 5/10-2.1-15.

In 2018, Younker applied for promotion to sergeant.  She scored well on the written test (the highest score of all candidates) and interview portions of the evaluation.  Timmins, Younker's supervising sergeant at the time, recommended that Wells award the full 10 points because Timmins believed she would be a top-tier candidate for sergeant.  Wells instead awarded Younker a single point while he awarded all other candidates—all straight men—at least 4 points.  This resulted in Younker's being seventh in line for promotion in the list of eight candidates, 7.77 points behind the top-raking candidate, in the April 14, 2018, list.  Wells justified scoring Younker so low compared to the other candidates based on his prior experience working with them as fellow patrol officers, including hearing Younker bad-mouth other officers and, as chief, receiving three citizen complaints about her tone and way of talking to others while working on the street.  In fact, at that point, Wells did not believe Younker was talking bad about other people behind their backs, and to the extent she did make such complaints, her complaints about her colleagues and supervisors were not worse than other officers' routine venting.  Greene, the top scorer on the list, was promoted to sergeant in July 2018.

In the spring of 2021, the new sergeants list was formed in the standard way.  Younker ended up being second on a list of three candidates.  Again, Wells decided to issue her fewer Chief's Points than any other candidate.  This time Wells used a rubric to award points for certain skills, but within the rubric categories the points were still subject to his discretion.  He

7

did not ask Greene, one of Younker's sergeants at the time, about her performance, and the points he awarded her were inconsistent with Greene's evaluation of her skills.  Wells ended up awarding her only two points, fewer than he awarded any other candidate.

In April 2021, several sergeant positions became available.  After the 2021 exam scores were released but before the 2021 list became effective on May 14, 2021, Wells promoted Brenton Rombach to sergeant using the 2018 sergeant's list.[1]  Rombach had scored lower than Younker on the written and interview parts of the 2018 evaluation, had less experience than Younker, and had scored only 0.65 points higher than she had in total.  He had also failed the written test in 2021.  Nevertheless, Wells took quick action to promote him before the 2021 sergeant's list became effective, at which point Rombach would no longer have been eligible for that promotion.  Wells also promoted Officer Buerke, who ranked above Younker on the 2018 list but below her on the 2021 list.  The new sergeants' promotions took effect May 6, 2021.

When another sergeant's position came open in June 2021, Wells promoted Aaron Burns, who scored higher than Younker on the 2021 sergeants list.  That left Younker as the only person remaining on the 2021 sergeant's list.  It is not surprising then that she was finally promoted to sergeant in July 2022, when another position came open.

*Detective Promotion*

Younker was also passed over for promotion to detective.  Historically, the WRPD filled detective positions based entirely on seniority of qualified officers.  When Younker became the most senior qualified officer and a detective position came open in February 2019, Wells decided to change the process and to select detectives through interviews rather than using the prior

---

[1] The Court is puzzled how any candidate from the April 14, 2018, sergeants list, which under Illinois law must be struck off the list after three years, could have received a promotion more than three years after the list was developed.  *See* 65 ILCS § 5/10-2.1-15.

seniority-based practice.  He assigned Johnson and Deputy Chief Dan Bunt to conduct the interviews and make a recommendation.  They recommended Rombach (the same officer they promoted to sergeant over Younker later in 2021), a straight man with only about four-years' experience, for the position.  They testified that they thought that his reports were of a higher caliber than Younker's and that his performance was thorough.  Wells accepted their recommendation and selected Rombach to become a detective.  As a consequence, Younker was not able to develop as much experience in investigation, one of the rubric categories for which Wells gave her no Chief's Points for the 2021 sergeants list.

*Major Case Squad Assignment*

An assignment to the elite regional Major Case Squad ("MCS") is prestigious and a career boost because of the additional training, networking, and earnings opportunities that come along with that assignment.  Before an officer can serve on the MCS, the officer must attend orientation ("the Summit").

In 2015, Younker applied to go to the Summit.  Bunt refused to allow Younker to go, telling her that, since she was pregnant, he believed she would not want to go.

Younker was able to attend the Summit in 2017 and became eligible to work on the MCS.  However, when Wells became chief, he told Younker he would not send her to work on the MCS, a five-day assignment, when called.  His general preference was not to send patrol officers because it would cause a hardship to the patrol division, although he does not remember any specific conversation with Younker telling her that.  She remembers him telling her he would never send her to work with the MCS so she needed to pick between her assignment to the Child Death Investigation Task Force ("CDITF"), an assignment she had taken in 2018, and the MCS, but she could not do both.  Although she thought a choice was not necessary, she chose to

remain on the CDITF and left the MCS since it was clear to her Wells would never let her go on an MCS assignment.

*Discipline/Internal Investigation*

Wells attempted to discipline Younker for the same conduct he let slide with other officers.  For example, she was made to rewrite reports that, in Timmins's opinion were as good as other officers' reports but the other officers did not have to rewrite their reports.  In addition, Wells and Johnson wrote up Younker for the kind of venting about supervisors and coworkers and other minor insubordination that other straight male officers routinely did without being disciplined.  One of Wells's complaints about Younker was that she allowed juveniles suspected of shoplifting to leave the police station without being turned over to a parent or guardian, but when Desherlia had been faced with a similar situation a year before, Wells had instructed him to do just as Younker had done.

Wells also had a meeting with Desherlia in November 2019 right after he became a sergeant in which Desherlia developed the impression that Wells wanted him to be stricter on Younker than other officers.  Wells also told him he would never promote Younker and behaved in a way that made Desherlia feel pressure to discipline Younker when she did not deserve it.

In May 2020, Wells notified Younker she was being investigated internally for insubordination—specifically, making negative comments toward her career around other police officers and negative comments about Wells.  He also cited the instance (described above) where she allowed juveniles suspected of shoplifting leave the police station without being turned over to a parent or guardian.  Wells put Johnson in charge of the investigation, and both held meetings with Younker on May 21 and 22, 2020.  In the May 21 meeting, Younker was not informed of what wrongdoing she had been accused of.  In the May 22 meeting, Wells offered to drop the

investigation if she would accept a written reprimand for "attitude toward profession."  She

declined.  On May 22, 2020, after the meeting and at Wells's direction, Johnson sent Younker a

memorandum about her failure to follow proper evidence logging procedures.

In the internal investigation, Johnson interviewed several specific people about Younker

at Wells's request and wrote a report of the investigation.  Two of those he interviewed were

Desherlia and Officer Mike Young.  Johnson prepared summaries of their interviews slanted to

give an impression neither witness intended to convey.  Johnson's report also inaccurately

described what happened at the May 21 and 22 meetings.  Wells ended up issuing Younker a

written reprimand based on her commenting in front of other officers that her career was at a

dead end, stating to another officer that Wells had showed up on a scene to "flex his muscles"

and "show who was boss," and her allowing the juveniles to leave the station without their

parents or guardians.  After appealing the reprimand through her union, the reprimand was

withdrawn.

On June 8, 2020, shortly after the reprimand was withdrawn, Wells moved Younker to

the 3 p.m. to 3 a.m. shift, the least desirable shift ordinarily given to the lowest ranking officers.

Although he denies doing this to punish Younker, with respect to another officer, he indicated it

would have been punishment to assign that shift.  Wells made the change based on a third-

party's report to him of a comment Younker supposedly made that she did not want to be a shift

supervisor because she was being set up for failure.  Younker never asked Wells or Johnson for

the shift change or not to be a supervisor.

*Supervisor Training*

In September 2021, when Younker was the only remaining person on the active sergeants

list for promotion, she attended a five-day supervisor training course.  In the middle of the week,

Wells spoke on the phone with the course instructor, who told him Younker had spoken negatively about Wells and the WRPD.  At Wells's request, the instructor also sent him a written summary of Younker's statements.  Wells filed an incident report and began investigating the matter.  On the morning of the fourth day of the course, Wells directed Younker to leave the course and return to patrol duty that evening.  Despite her being next in line for promotion to sergeant, Wells told her he saw no value to her continuing in the supervisor training class.  When Wells later asked the instructor to sign a statement about Younker's conduct, the instructor refused to cooperate with Wells in the matter.  Wells dropped the investigation.

*Complaints of Discrimination*

After Wells awarded her only one Chief's Point on the 2018 sergeant's list, Younker complained to him that she thought she was being discriminated against.  Wells responded that she should "do something about it," but suggested no action and did not follow up.

Younker finally reported the harassment she experienced to Desherlia in 2019 when he became her supervisor.  He then relayed her complaints to Wells and Johnson, but they refused to document, consider, or investigate her complaints.

When Younker complained through her union representative in May or June 2020 about sex, sexual orientation, and union membership discrimination, Wood River's city manager responded that she was blowing things out of proportion.  Wells refused to accept a complaint of discrimination unless it was written and submitted according to the city's policy.  Later he acknowledged her oral complaint but encouraged her to "give it some thought" before filing a written complaint with the city manager.  Younker never filed a written complaint with the city.

In August 2020, Younker filed a charge of discrimination and retaliation with the Illinois Human Rights Commission ("IHRC") and the Equal Employment Opportunity Commission

("EEOC").  After learning of Younker's charge, Wells instructed Timmins to document everything Younker did wrong at work.

Younker filed this lawsuit in February 2022 alleging six counts:

Count I:        a claim under 42 U.S.C. § 1983 against all defendants for violation of the Fourteenth Amendment Equal Protection Clause by harassment and discrimination on the basis of sex and sexual orientation;

Count 2:        a claim under Title VII of the Civil Rights Act against Wood River for intentional discrimination on the basis of sex and sexual orientation, including a hostile work environment;

Count 3:        a claim under the Illinois Human Rights Act ("IHRA") against Wood River for discrimination on the basis of sex, including a hostile work environment;

Count 4:        a claim under Title VII against Wood River for retaliation and discrimination for failure to promote;

Count 5:        a claim under the IHRA against Wood River for retaliation and discrimination for failure to promote; and

Count 6:        a claim under Title VII against Wood River for intentional and unintentional discrimination.

As pled, the foregoing claims appear to overlap and/or to be redundant to some extent.  Suffice it to say that Younker has essentially alleged discrimination on the basis of sex and sexual orientation in the form of a hostile environment, intentional disparate treatment, and disparate impact, as well as retaliation.

The defendants now ask the Court for summary judgment on all counts on the grounds that there is no evidence of intentional discrimination, no evidence to support a *prima facie* case under the *McDonnell Douglas* burden shifting scheme, no policy having a disparate impact on a protected class of which Younker is a member, and no evidence of retaliation for exercising a protected activity.  Younker disagrees on each point except whether there is a policy with a disparate impact, a claim she concedes she wants to dismiss.

13

III.     **Analysis**

Analysis of the pending motion is complicated because a reasonable jury could easily find that Wells and Johnson did not like Younker and took action to interfere with her success in the WRPD, then complained that she developed a negative attitude toward them and their interference and felt comfortable expressing her frustration to her coworkers.  But the parties' dislike of each other is not the critical issue; whether the dislike was because of Younker's sex and/or sexual orientation is.  The Court keeps its focus on this question in its analysis.

A.     Hostile Environment

The Court starts by evaluating Younker's claims that she was subject to an objectively hostile environment based on her sex/sexual orientation.  Title VII prohibits employment discrimination on the basis of sex:  "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ."  42 U.S.C. § 2000e-2(a)(1).  "[B]ecause of . . . sex" includes "because of sexual orientation."  *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741-42 (2020).  The prohibition of sex discrimination includes the prohibition of sexual harassment that creates a hostile or abusive work environment.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).  And whether an environment is "hostile" for equal protection purposes is essentially determined using the same standards in the Title VII context.  *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001).

A Title VII hostile work environment claim can be brought to remedy conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  *Meritor*, 477 U.S. at 65.

To prevail in a sexual harassment claim, a plaintiff must prove "(1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018); *accord Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012).  The defendants challenge, among other things, Younker's ability to prove the third element—the severity or pervasiveness of the offensive conduct.

Sexual harassment that creates a hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor*, 477 U.S. at 67) (further internal quotations omitted); *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 752 (1998); *Passananti*, 689 F.3d at 667. "[H]arassing conduct does not need to be both severe *and* pervasive.  One instance of conduct that is sufficiently severe may be enough." *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (emphasis in original; internal citations omitted).  On the other hand, a "relentless pattern of lesser harassment" may also suffice.  *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (internal quotations omitted).

Determining what is sufficient to constitute an objectively hostile working environment is not an easy task.  The Court must examine the totality of the circumstances and "should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1045 (7th Cir. 2000).  The environment must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (quoting *Harris*, 510 U.S. at 23) (further internal quotations omitted); *accord Passananti*, 689 F.3d at 667. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotations and citations omitted); *accord Passananti*, 689 F.3d at 667.

The harassment Younker describes was not so severe or pervasive that a reasonable jury could conclude it amounted to an objectively hostile work environment. She describes offensive, inappropriate comments about her sexual orientation from coworkers when she first started working for the WRPD, but those subsided over time as her coworkers came to know her and respect her as a colleague. Indeed, with respect to those comments, Younker exhibited she was a "mature individual[] with the thick skin that comes from living in the modern world." *Swyear*, 911 F.3d at 881.

Johnson's offensive comments persisted, but Younker does not describe an environment so infused with discriminatory or offensive comments that a jury could find it altered the terms and conditions of her employment. Additionally, she alleges no incidents involving threats, physical touching, or other more serious harassing conduct, only verbal conduct, which is generally viewed as less serious unless it is extremely pervasive. But it was not pervasive in Younker's work environment. In sum, Younker simply does not point to severe or pervasive enough conduct by anyone at the WRPD to create a hostile work environment.

Because the evidence in the record is insufficient for a reasonable jury to find Younker was subject to an actionable hostile work environment, the defendants are entitled to summary judgment on those claims.

B.    Intentional Discrimination

1.    Wood River

a.    Title VII and IHRA

Wood River asks for summary judgment on Younker's intentional discrimination claims under Title VII and the IHRA.  Generally, at the summary judgment stage, courts will apply the same analytical framework to both kinds of discrimination claims.  *See Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016) (calling the frameworks "essentially identical").  So although the Court will speak in terms of Title VII, the analysis applies equally to her IHRA claims.

Traditionally, courts have analyzed discrimination claims at the summary judgment stage using the so-called "direct" and "indirect" methods of proof.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763 (7th Cir. 2016) (citing as examples *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014); *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684 (Ill. 1989)). However, in 2016, the Court of Appeals for the Seventh Circuit encouraged courts to dispense with the direct/indirect dichotomy and concentrate on "the sole question that matters" and the evidence relevant to that inquiry.  *Ortiz*, 834 F.3d at 764.  In a discrimination case, that question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Id.* at 765.  *Ortiz* was clear, however, that the burden shifting summary judgment analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), remains available as a formal way of analyzing a case with certain types of circumstantial evidence.  *Ortiz*, 834 F.3d at 766; *see Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018).

17

Indeed, Wood River focuses on the weaknesses of Younker's case under the *McDonnell Douglas* burden-shifting framework.  Under that framework, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably."  *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (internal quotations omitted).  If a plaintiff successfully demonstrates each of these elements, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Id.*  If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show that the articulated reason is actually a pretext.  *Id.*  At the pretext stage, the plaintiff must provide evidence that the employer's stated reason for the adverse action is dishonest *and* that the true reason for the action was discriminatory intent.  *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009).  "[She] ultimately must be able to point to some circumstances from which an inference can be drawn that the real reason for the employment action was discriminatory."  *Id.*

Wood River disputes whether Younker can show that she was meeting legitimate job expectations, that other similarly situated straight males were treated better, or that Wood River's explanation for passing her over for sergeant or detective—a history of badmouthing others in the department and the WRPD itself, of citizen complaints, and of failing to follow procedures— were pretext for sex/sexual orientation discrimination.

Younker points to favorable reviews from her immediate supervisors and awards and commendations to show she was meeting legitimate job expectations that were applied to other officers.  To the extent the WRPD found she did not meet its expectations *of her*, she points to

18

circumstantial evidence that those expectations were higher than those demanded of the rest of the police force which, with two brief exceptions, were all male and all straight.  All this, and the contortions the WRPD made to its existing promotion procedures to promote straight males, Younker contends, is enough to suggests WRPD's proffered reasons for its actions were false.

The Court questions whether the *McDonnell Douglas* burden-shifting framework is appropriate for this case where others outside Younker's protected group were in so many varied positions that there is unlikely to be a directly comparable coworker.  After all, to be similarly situated for framework purposes means an employee must be "directly comparable . . . in all material respects."  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  Those "material respects" depend on the specific situation involved in the case and may include whether the employees dealt with the same supervisor, were subject to the same standards, or had comparable experience, education and qualifications, if the employer took these factors into account when making the personnel decision in question.  *Patterson*, 281 F.3d at 680.  But the lack of any similarly situated employee is not the death knell of an employment discrimination case; plenty of disparate treatment because of sex can occur even with no appropriate comparable employee.  In such cases, a bigger picture focus on the relevant question is more appropriate:  "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused the discharge or other adverse employment action."  *Ortiz*, 834 F.3d at 765.

Taking a look at all the evidence with the ultimate question in mind, the Court finds that a reasonable jury could infer that Wells and Johnson did not like Younker and did not want her to succeed.  With respect to the 2018 sergeants list, Wells was quick to use his discretion to award her only 1 Chief's Point, the lowest he gave any candidate by at least 3 points.  He did this

despite Younker's sergeant's recommendation to award her 10 points because she would be a good sergeant.  Wells justified it by his own subjective experience with other officers, her run-of-the-mill complaints about her coworkers, and citizen complaints about her tone and way of talking—all of which may sound like objective criteria but actually leave plenty of room for discrimination.  A reasonable jury could conclude that such a severe result—only receiving 1 of 10 possible points—grounded in such subjective, discretionary factors for someone otherwise well qualified to be a sergeant suggests at the least personal animosity toward Younker.

Again in 2021, a reasonable jury could conclude Wells was not interested in promoting the most qualified candidates.  He awarded Younker only 2 discretionary Chief's Points—using a rubric he called objective but which again left room for discrimination in the exercise of discretion—and then pulled strings—rushing a decision possibly from an expired list—to promote to sergeant an officer who had just failed the written sergeant's test and another who had scored lower than Younker in the 2021 ranking.  A reasonable jury could infer that Wells's motive was not to pick the best candidate for sergeant but to tinker with the assessment tools to Younker's detriment for his own personal reasons.

Wells also discarded the established system for selecting detectives once it became apparent that Younker was at the top of the list for promotion.  He assigned Johnson, a purveyor of offensive comments about Younker's sexual orientation, and Bunt, who declined to send Younker to MCS training in 2015 because she was pregnant, to interview detective candidates.  Johnson tinkered with reports of the interviews to make them inaccurate and then recommended Rombach, a straight male with far less experience that Younker.  Johnson thought that Rombach was thorough and wrote better reports that Younker did, other subjective judgments possibly tainted by his sex/sexual orientation animus.  Wells acted on Johnson's recommendation, thus

20

incorporating Johnson's animus toward Younker into the hiring decision.

Other circumstantial evidence suggests that, for questionable reasons, Wells wheedled Younker off the MCS, interfered with her supervisor training, sought to discipline her for conduct he let slide with other officers, and held her to higher standards than other officers. The evidence also suggests Wells and Johnson refused to accept or look into Younker's complaints of discrimination, and that Wood River's city manager responded to her complaints by telling her she was blowing things out of proportion.

It is a close call whether this kind of adverse conduct toward Younker was simply from a personal dislike of her or because of her sex/sexual orientation. But several factors could lead a reasonable jury to conclude that it was because of her sex/sexual orientation. Johnson's offensive comments about lesbians are evidence of sexual orientation animus. Furthermore, the fact that neither Wells, Johnson, nor the Wood River city manager were interested in hearing Younker's complaints about sex discrimination also shows hostility—or at least utter indifference—toward equal treatment of lesbian employees. In light of these factors, a reasonable jury could conclude that the apparently poor treatment of Younker by the WRPD was because of her sex/sexual orientation. Whether a jury actually draws that conclusion remains to be seen, but Younker is entitled to an opportunity to present her Title VII and IHRA intentional discrimination case to a jury.

b.       § 1983 Equal Protection

Wood River does not appear to have sought summary judgment on Younker's equal protection claim against it. Nevertheless, the Court is hesitant to proceed with this claim because at least part of that claim appears to have no merit.

A municipality like Wood River may not be held vicariously liable for actions of its

21

employees under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *Bd. of Cty. Comm'rs of Bryan Cty., Okla.. v. Brown*, 520 U.S. 397, 403-04 (1997); *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1125 (2021). However, it can be liable under § 1983 when the institution itself, by its own actions, *caused* the deprivation of rights. *Monell*, 436 U.S. at 691-92; *J.K.J.*, 960 F.3d at 377; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017). A municipal action occurs where (1) the municipality had an express policy calling for a constitutional violation, (2) the municipality had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) if a person with final policymaking authority for the municipality caused the constitutional violation. *Monell*, 436 U.S. at 694; *J.K.J.*, 960 F.3d at 377; *Glisson*, 849 F.3d at 379.

Count 1 of Younker's complaint appears to attempt to plead § 1983 equal protection claims against Wood River based on the conduct of Wells and Johnson under a *respondeat superior* theory. Compl. ¶¶ 172 & 173 ("This misconduct described in this Count was undertaken by Defendant [Chief Wells or Deputy Chief Johnson] within the scope of his employment and under color of law such that his employer, Defendant City of Wood River, Illinois is liable for his actions.") (Doc. 1). However, there is no *respondeat superior* liability under § 1983, so these claims cannot succeed. The Court will dismiss this claim at this point under its authority to dismiss frivolous claims spontaneously to "save everyone time and legal expense." *Hoskins v. Poelstra*, 320 F.3d 761, 763 (7th Cir. 2003).

Younker also alleges in her complaint that Wood River had "[a] discriminatory culture, policies and practices," Compl. ¶ 174 (Doc. 1), but does not give details other than that she believes she suffered a number of discriminatory incidents by Wells and Johnson. However, the

defendants did not challenge this claim and theory in the summary judgment motion, so it remains for trial.

> 2.  <u>Wells and Johnson</u>

With respect to Younker's equal protection intentional discrimination claims against Wells and Johnson, the defendants argue there is no evidence that they had the requisite intent to discriminate because of Younker's sex/sexual orientation.

The Equal Protection Clause of the Fourteenth Amendment forbids any state to "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Essentially, the clause guarantees "a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980). This includes the right to be free from discrimination on the basis of sexual orientation. *See Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015).

In order to prove an equal protection claim, a plaintiff must show that a state actor has purposefully treated her differently from persons not in her protected group. *Arlington Hts. v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229, 239-42 (1976); *see City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003). Again, at the summary judgment stage, courts apply the Title VII analytical framework to equal protection sex discrimination claims. *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020).

For the same reasons discussed in the foregoing section with respect to the intentional discrimination claims against Wood River, the Court believes a reasonable jury could also conclude that Wells and Johnson purposefully treated Younker differently from others not in her protected category and that a reasonable jury could find that the different treatment was because

of her sex/sexual orientation.

The evidence shows Johnson bore an animus toward lesbians and an animus toward Younker in particular, which is enough to create a jury question whether, by participating in the conduct set forth in the previous section, he intentionally discriminated against Younker because of her sex/sexual orientation.  There is also a genuine issue of material fact, at the least, whether that discrimination played a role in her not getting promoted.

As for Wells, again it is a close call.  However, he displayed animus toward Younker personally and implicitly supported Johnson as demonstrated by his failure to accept or investigate Younker's allegations, relayed through Desherlia, that Johnson had harassed her.  His subsequent selection of Johnson as gatekeeper of the detective position and as the leader of the investigation of Younker's alleged misconduct calls into question whether he also intended to discriminate against her on the basis of her sex/sexual orientation.

For these reasons, the Court will deny Wells's and Johnson's request for summary judgment on Count 1, which will proceed to trial along with Younker's discrimination claims against Wood River.

      C.    <u>Retaliation</u>

Wood River asks for summary judgment on Younker's retaliation claims under Title VII and the IHRA.  Title VII prohibits retaliation for reporting sexual harassment:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees. . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  So does the IHRA.  *See* 775 ILCS § 5/6-101(A).  Again, the analytical framework for both statutes on

24

summary judgment is essentially the same.  And again, although there is a history of applying various direct or indirect methods of proof on summary judgment, *see Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004), the ultimate question is whether there is enough evidence for a reasonable jury to find that the plaintiff engaged in protected activity and suffered an adverse employment action because of it.  *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017).  Adverse employment actions are any actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).

There is sufficient evidence from which a reasonable jury could conclude that Wood River retaliated against Younker for complaining of discrimination.  Wood River asserts it did not know Younker had participated in any protected activity until it got notice of her September 2020 IHRC/EEOC charge, so retaliation could not have been its motivation for any action prior to that date.  However, the evidence shows Younker complained much earlier than that.  She complained to Wells about discrimination in 2018 after the sergeant selection process.  She also complained of harassment to Desherlia in 2019 when he became a sergeant, and Desherlia passed those complaints on to Wells and Johnson.  Additionally, in May or June of 2020, Younker made complaints to the Wood River city manager through her union representative about sex/sexual orientation discrimination.  Wood River's assertion that it could not have retaliated against Younker because it did not know before the fall of 2020 that she had complained rings hollow.

Wood River justifies its adverse actions—its multiple failures to promote Younker, its pressuring her to resign from the MCS, its interference with her completing supervisor training, its criticism of her work and investigating her for conduct accepted from other officers, its

assignment of her to the least desirable shift (described in other contexts as punishment), and several other actions—by her failure to perform her job adequately and her disparaging comments about Wells and the WRPD.  However, in light of the evidence that Younker's supervisors thought she did her job well and some of the questionable circumstances surrounding these decisions, a reasonable jury could find these adverse actions would dissuade a reasonable person in Younker's position from exercising her right to make such complaints and were in retaliation for Younker's complaints of discrimination.

      D.    <u>Disparate Impact Discrimination</u>

Title VII prohibits an employer from using a facially neutral "employment practice that causes a disparate impact on the basis of . . . sex . . . and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k); *accord Downing v. Abbott Labs.*, 48 F.4th 793, 815 (7th Cir. 2022), *cert. denied,* 143 S. Ct. 1012 (2023).  As the statutory text suggests, the employee has the initial burden to show a facially neutral policy has an adverse impact, then the burden shifts to the defendant to show the policy is related to the employee's job and a business necessity. *Downing*, 48 F.4th at 815.

Wood River asks the Court to dismiss Younker's Title VII disparate impact claim because Younker has not pointed to any facially neutral policy of Wood River that had a disparate impact.  Indeed, in her response brief, Younker asks that her disparate impact claim be dismissed.  The Court construes this as an admission that her claim has no merit and will, accordingly, grant Wood River summary judgment on any such claims.

**IV.**    **Conclusion**

For the foregoing reasons, the Court:

- **DENIES** the defendants' motions to strike (Docs. 40 & 45);

- **GRANTS in part** and **DENIES in part** the defendants' motion for summary judgment (Doc. 32).  Summary judgment is **GRANTED** on Younker's:
    - sex/sexual orientation hostile environment harassment claims;
    - § 1983 equal protection claims against Wood River based on a *respondeat superior* theory; and
    - disparate impact claims;

  The motion is **DENIED** in all other respects; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

**IT IS SO ORDERED.**
**DATED:  May 4, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

27